We'll next hear the case of Broidy Capital Management. Chief Judge Katzmann, and may it please the Court. In my time here, I'd like to address two points, one substantive and one procedural. And briefly, they are, first, that Jamal Ben Amar's claim of diplomatic immunity ultimately fails under the Vienna Convention's commercial activities exception, under which a foreign diplomat who provides professional or commercial services for personal profit in the United States is not immune for claims related to that activity. Second, in granting Ben Amar's 12B1 motion, the district court didn't give us a chance to develop our case that this exception applies. It didn't permit any jurisdictional discovery of facts largely in Ben Amar's control regarding his commercial activities. It also didn't allow us to amend to allege facts relevant to this exception. The court said that we'd taken our best shot and come up short, but in reality we hadn't even gotten to the free throw line. The relief we're ultimately seeking here, then, is a remand to permit amendment and limited jurisdictional discovery. Now let me jump right to the government's position on the merits. The U.S. government's amicus brief contends that the commercial activities exception doesn't apply because Ben Amar was not a diplomatic agent for Morocco at the time of the relevant conduct, which we allege was undertaken as part of his for-profit commercial work. The U.S. argues on page one of its brief that the text and history and purpose of the Vienna Convention make clear that the exception has no bearing where, as here, the relevant conduct occurred before the diplomat began serving as a diplomat with official functions. Apart from the as here part, we agree with that. Morocco and Ben Amar have consistently stated that Ben Amar has been serving as a Moroccan diplomat in New York since November 1, 2017, at the highest ranking level of, I think, counselor plenipotentiary. Just backing up for a minute. Yes. As you finish that thought, you, as I take it, agree with the State Department's general proposition that the language with respect to commercial activity exercised by a diplomatic agent in the receiving State outside his official functions only applies to professional or commercial activity undertaken after obtaining diplomatic status. No, after while a diplomatic agent. And here's the rub, Your Honor. At page eight of the government's brief, the government says, and I'm going to read it for you. So before obtaining diplomatic status, which is your question, an individual is not a diplomatic agent with official functions. There is absolutely no support in the government's brief for that proposition. And as a matter of fact, it's quite counter-textual when you read, when you break down the Vienna Convention.  So let's say you look at the case of U.S. v. Lumumba, a 1984 Second Circuit case. There the court held that the Vienna Convention, quote, premised diplomatic immunity upon recognition by the receiving State. That's correct. Immunity is premised. But the question of whether someone is a diplomatic agent is a different question. And what the Vienna Convention says is that a diplomatic agent, Article I defines diplomatic agent as either the head of the mission or a ranking diplomat, basically the senior diplomats of the mission. So what, the point here. So aren't you asking really for sort of two clocks in a way, one that refers to diplomatic immunity and another for diplomatic immunity itself? One that defines, the question is, when does someone become a diplomatic agent for purposes of Article 42 and Article 31? So are you saying that a diplomatic agent, functioning as a diplomatic agent, could be engaged in activity that would qualify as an exception to diplomatic immunity without actually possessing diplomatic immunity? The language of Article 39 says that a diplomat may not enjoy the immunity to which they are entitled until notification, or at least in the case of someone already in the country. So, yes, that's precisely what we are saying. The point is, if you look at Article VII, Article VII of the VCDR says that the standing state may freely appoint the members of the staff of the mission. And that is subject only to the provision of Article V, Article VIII, Article IX, and Article XI. What's missing from that is Article X. Article X is the notification provision. The notification provision is not a precondition. If we could get to the exception, the activity in question was hacking activity for political purposes? How is that commercial activity? Well, because it's part of a broader campaign that Benamar that ---- How is a broader campaign commercial activity or professional activity? The broader campaign was professional activity advising a third-party country on the public relations effects of ---- on how Qatar can improve its public relations in the United States. Isn't that the kind of activity that a diplomat would ordinarily engage in? Not for pay for a third-party country, Your Honor. That's the key. What ---- Al-Aham said that the money was really owed to him by Qatar, right? The state of Qatar. This is in his deposition. I'm sorry. Al-Aham said that the money that was owed ---- Here's the question. You're familiar with this. Yeah, yeah, no, I just want to ---- The question, you were seeking to pursue Jamal Benamar for that money, even though the money was really owed to you by the state of Qatar, correct? Answer, yes. Yes, but the logical inference from that is ---- I mean, the logical question that arises from that is why is he seeking this money from a diplomat from Morocco? I mean, the point is that Jamal Benamar was in the middle of the relationship between agents for Qatar and Qatar. And, in fact, when there was a dispute about money, the first instinct of that agent was to seek relief from Benamar. Now, yeah, he thought ultimately the money was owed to him by Qatar, but Benamar was serving as an intermediary. That's exactly what that shows. And so he was moving a ton of money on behalf of Qatar, according to the allegations of our complaint, and supported by that and various other documents. So the ---- How is that commercial, following up on Judge Chin's question, how is that commercial? Well, it's part of a broader public relations campaign for Qatar. Qatar was seeking to improve its status in the United States. It hired ---- How is that commercial? If a country wants to improve its status in the United States and spends money, even though money is involved, does that become commercial activity? It's not what one would ordinarily think of as commercial activity. The standard is professional or commercial activity, Your Honor. And, I mean, it's as if he's serving in the same sort of role as these other registered agents were. Just because one is receiving remuneration does not mean that that is professional or commercial activity. No, no. I mean, remuneration is evidence of professional or commercial activity, but the nature of the activity itself is the sort of lobbying and public relations that's covered by FARA. I mean, the point is that a U.S.-based lobbyist who Qatar would hire would be engaged in professional activity. Yes, Your Honor. Your argument is that lobbying activity to improve the status of a country is commercial activity. It's professional or commercial activity within the meaning of the standard. That's correct. If he ---- Your Honor. What profession does that become? What profession is that? Well, Your Honor, I mean, it's government relations. It's lobbying and it's public relations. These are all standard professions that people engage in. So the point is that a diplomat for country A can't hang out a shingle and rent out his services to other countries without engaging in professional activities. On the burden of burden issue, you say that you're entitled to jurisdictional discovery because you alleged a prima facie case of jurisdiction. Yes, Your Honor. How would you deal with the argument that your position would or could subject a diplomat to jurisdictional discovery merely by pleading that the diplomat was secretly being paid by an outside entity when the idea of diplomatic immunity is to shield diplomats from that kind of ---- Yes. Your Honor, we've done more than alleged. We've cited specific documents, you know, showing that Jamal Ben Amar was overseas reviewing documents, stolen documents, stolen e-mails relevant to this case. So our amended complaint isn't just conclusory allegations. It is fact-based. So while they are allegations at this point, they are allegations based on texts, based on phone records, based on the limited discovery that we were able to use from California, which, by the way, there's more discovery in California that we haven't been able to use that I can represent as relevant to this. So if we sought, if we were given discovery, we would seek in the first instance some of that discovery that we aren't allowed to use because of a protective order in California. You say that you didn't have the opportunity to seek jurisdictional discovery. But when you look at the joint appendix at 142, the district judge says he was ---- the district judge was pretty clear that if Mr. Broidey was unable to respond to the motion to dismiss without discovery, quote, you can put in your opposition, if it's the case, that we need this, this, and this before you judge, can decide that. And if I agree with you, then we'll have jurisdictional discovery. Yes, Your Honor. And we did respond by saying that we hadn't been allowed any jurisdictional discovery and we needed ---- the district court also said, you know, I understand you want bank records and the like. And that was our point in the 12B1 opposition, that we needed discovery and that that discovery would get at the financial relationship between Cutter and Jamal Ben Amar. Thank you. Your Honor, I'm fairly over my time, so I reserve two minutes. Thank you.  Good afternoon. May it please the Court. I am Abbey Lowell on behalf of the appellee. Let me start, Judge Katzmann and Judge Tinn, by answering a threshold question which I believe doesn't then get to require you to do any others. Appellant's argument as to when there is this window of opportunity to sue somebody depends on appellant making the argument that there's a difference between when somebody, in using his terms as a diplomatic agent, versus when that person gets immunity. And therein lies the problem. Immunity is what counts. What also counts is that appellant, when he comes before you, wants you to ignore the eight occasions in the record in which he argued just the opposite, that the immunity mattered and the immunity didn't take place until the receiving country acknowledged that that was the event which conferred the immunity. Over and over again. Here's my question, or a question. The United States takes the position that the date relevant to diplomatic status is September 21, 2018, the date on which the Moroccan mission first notified the United States mission of diplomatic status. Why isn't the relevant date, November 13, 2018, the date that the United States mission to the United Nations registered you with diplomatic privileges and immunities? Because if you look at the court's decision in Lumumba, it seems to suggest that the date immunity is recognized by the receiving State is the relevant date, rather than the date that immunity was first sought by the Senate. I think there is an ambiguity in various cases which talk about the difference between when the sending State notifies versus when the receiving State acknowledges. But for this case, Your Honor, it doesn't make a difference. It doesn't make a difference because the acts that the appellant argues provide the basis of an exception under the commercial activity exception occurs before both of those dates. I will say, though, that the United States position makes some sense in the following way. I mean, he used a sports analogy, let me use one in return. A pitcher can throw a ball intending it to be a strike. The catcher can frame his mitt to catch it as a strike, but it's not until the umpire says it's a strike that it's a strike. And by the way, given the deference this Court's supposed to play, there's no instant replay. So the point is, is that in this case, whether it's September or November, in the matters of what appellant says, it won't make a difference. Our view is that it applies on the proper notification. However, the receiving State gets to tell you when you properly notified. Look at the record. Three or four times Morocco said he's of this, he's of that, or here's the documents. Three times the United States said that's not quite right. But when the United States said it was right, even before he got his blue card in that period, whatever the days would be, that immunity would have attached. And in terms of this concept, it may not make a difference. Because whether the Court sorry. So what is your you said the United States position makes some sense. Do you agree with it or not? I make sense. No. On our position is that when there's on the on the on the just so that I can be specific. Sure, I understand that the commercial activity exception only applies to under to commercial activity undertaken after receiving that part. Not only we agree with we made that argument in the district court in our appendix to our motion to dismiss where we had as a very specific argument that the act is, if you will, the slate is wiped clean by the grant of the immunity. We said diplomatic status immunity prohibits suits regarding acts committed prior to the diplomatic mission. So we do believe that the measuring stick of commercial activity. And it makes sense because of the text of the VCDR, which right up front says a person will be, quote, immune except for. And we know that because of this, the case in the district court here in the circuit course in Cobra Gotti, which is even more profound. That's a criminal case where you have an arrest, you have an indictment, you have all the proceedings and the immunity is conferred later and it wipes the slate clean. The standard is it's a kind of agreement between a receiving state and a sending state. We're going to make sure you're not interfered with. Your diplomats can operate the way they're supposed to. In return, your diplomats cannot be in commercial activity. That structure reflects both the text and the reason why it is that commercial activity is decided after the person as the only exception. But as Judge Chin's questions, let's say that wasn't the case. Let's say somehow miraculously commercial activity can be sustained or revived or somehow survives the grant of immunity. This was far from commercial activity anyway. You look at all the reasons that commercial activity exception exists in all the text. You don't have to contort yourself. You look at its common understanding, according to this court. It's a trade. It's a business. There are other glosses. It's continuous. It's not one-off. Using the concept that somehow PR or lobbying might, there's a case in point. The Heaney case was a PR campaign by a foreign country. That was not found to be commercial activity. You look for its common understanding. It's basically if it looks like it and smells like it. And look at the Fourth Circuit case in Tabion or the district court. It sets out the kinds of things that could be commercial activity. Be a tailor. Be a retailer. Do something that we recognize. It has to be continuous. It has to be for profit. It has to not look like something other woulds. And this district court here also had the DNC case last year. And the DNC case is very interesting, because it could be written about this case. When the court said that cyber attacks and the dissemination is not the kind of trade or practice, and that was under the broader exception, the FSIA exception, which is a broader exception, they said it doesn't satisfy the trade or business or commercial activity for that. So how could it possibly satisfy for a lower one? So to answer your question, we believe the United States is spot on correct, but if you step back, it's not commercial activity whenever it occurred. As to the issue of discovery, I want to say a word about that and about amendment as well. Appellant comes forward even five minutes ago and says, well, we didn't have discovery, but then at the same time, appellant concedes that they did have discovery. And they had enough discovery in order to put in an amended complaint, which they cite 74 times as if it had been accepted in the record when it has not been. All the allegations that they say provided the threshold to get discovery. One thing about discovery in this context, you can't look at discovery in this context outside of what it exists in, which is in diplomatic immunity. Discovery in status immunity basically erodes the very reason why there's diplomatic immunity. You're not supposed to indulge. When the appellant wants you to look at the text, I invite the court to look at the text of Article 31, Clause 2 in the VCDR, which says that a diplomat will not be obliged to give discovery, period. It doesn't say obliged discovery unless an exception is alleged. Indeed, that sentence comes immediately after there are three exceptions to immunity. Therein lies the concept. So I ask the court to look at the idea of why discovery is different in this context, and I'd like the court, in thinking about that, let me suggest three prisms to view this case as you are receiving it. First is the prism of deference. There are five levels of deference here. Morocco gets to decide who to declare, the United States accepted it, the U.N. accepted it, the district court with all the record found it existed and that there was not an exception, and then recently the United States comes forward. That's five levels of deference. The second prism is the one of who is the beneficiary of this concept. It's not Mr. Benamar. It's the kingdom of Morocco and the 162 other countries that signed the VCDR for purposes of making sure that they are not interfered with. And the third is the one of reciprocity. And the courts couldn't be clearer, be careful here as we expand the exceptions and narrow the protection, because what happens here happens to our diplomats abroad. And this district court was the one who had the record, understood what she had given appellant the right to be able to pursue and apply for the VCDR. And I can argue, just as you pointed out, Judge, that she said you can go outside the pleadings, this is a 12B1 evidentiary motion, and tell us in the opposition what you want. And this is what they said they wanted when they were given two opportunities. This is it. Plaintiffs are entitled to discovery concerning Benamar's position with the Morocco mission, his outside commercial activity for profit, his residency in the U.S. and the entire scope of his relationship with Qatar. You might as well take down the wall of immunity. It's basically saying we want discovery about everything. And that's not in this context what's allowed. When she gave them the opportunity to say why they needed more and why the opposition couldn't go forward, what they said was one sentence, which was not nearly the specificity required under the rule, and that's why the district court said you didn't do it when I asked you to. I gave you your best shot and you didn't come up with it. So let me summarize the three points. First, if you want to find when the immunity attaches, it attaches in our view when proper notification occurred. Proper notification occurs not by us self-declaring it, that's the Lumumba case or the Kuznetsov case. We can say it, but it ain't so until somebody says it's so. The United States said it was so in the fall of 2018. The commercial activity exception applies only when that occurs. It wipes the slate clean before, and there's good reason why it wipes the slate clean before. And as to whether or not there was a need for discovery, Appellant wanted it both ways. He had 84 subpoenas in California, he subpoenaed the records of Mr. Benomar, he got what he needed to write an amended complaint, which didn't get to the level of specificity, and finally the court said you're not understanding, Appellant, this is not a plea. It's a pleading deficiency, this is an evidentiary deficiency, and you haven't come up with anything to overcome the extraordinary reasons we have diplomatic immunity. Thank you for your time. Thank you. May it please the Court, Martin Totaro on behalf of the United States. Jamal Benomar is entitled to diplomatic immunity and dismissal from plaintiff's lawsuit because he is currently an accredited diplomat, and plaintiffs have not shown that Biden's diplomatic immunity has been met. Can I ask you about the relevant date? So you date Benomar's relevant diplomatic status to September 21, 2018, and that's when the Moroccan mission first notified the U.S. mission of Benomar's diplomatic status. And so my question is, which I've asked your colleagues, why isn't the relevant date November 13, 2018? That's the date that the U.S. mission to the United States registered Benomar with diplomatic privileges and immunities. And I ask that question in the context of United States v. Lumumba, which seems to suggest that the date immunity is recognized by the U.S. mission is the receiving date, rather than the date when immunity was first sought by the sending state. Chief Judge Katzmann, I'll give two responses, a factual response and a legal response. The factual response is that the notification in this case is a little muddy because the notification on September 21, and then again on October 5, was improper under the Vienna Convention. For individuals who are accredited to the U.N., the notification is supposed to go to the U.N. first, and then the U.N. then notifies the United States, and it's that particular notification, which we note in a footnote happened on October 10. So that's just the factual part of it. The legal part of it, Lumumba states that recognition and notification are what demonstrates diplomatic status. That particular point is supported by the first reporter's note in the restatement section 464, which states that notification and recognition could occur before an individual becomes a diplomatic agent, and you need both to become a diplomatic agent. The potential problem that is not implicated by this case is when there is a difference between the two dates, and some commercial activity happens in the meantime. I think part of the difficulty in this case is that our notification, and this is at JA-269, stated that you have diplomatic status as of November 13. I'm not sure, Your Honor, if that was referring to we are recognizing that you have diplomatic status on November 13, or whether that says we recognize that you have status on November 13, but it reverts back to the date of proper notification on October 10. The critical point for these purposes is that it doesn't matter in this case, because all of the relevant conduct occurred before September 21, so one could imagine a case where the distinction matters. I don't think that this is this case. Moving to the core argument, it seems as though all parties now agree that there is a temporal limitation to the commercial activities exception, and that's supported by the text, which explains that the commercial activity exercised by the diplomatic agent in the receiving state outside is official functions, which obviously contemplates that the person had official functions. Also supported by the structure, as the United States has noted for almost 50 years, in a position that is entitled to deference, the commercial activity section exception works hand-in-hand with Article 42, which prevents diplomats from acting outside of the scope of their duties. And then the purpose, the negotiating, and the drafting history is replete with references to this exception in Article 42, as necessary to recognize that diplomats are not allowed to engage in these functions, and when they do, they open themselves up to suit. I'm happy to discuss more about the temporal element of the commercial activities exception, although I see my time is running down, and if not, I would turn to the burden issue. In terms of the burden, we merely ask that the court not replicate the error in some cases where the burden is imposed on the defendant to establish immunity, and instead go with the typical burden requirement, which places the burden on the plaintiff to establish jurisdiction in the first instance. Moving to jurisdictional discovery, basically we, everything we said in our brief holds true today. This Court had it right in Arch Trading, and the same concerns that illuminated the Court in that case apply with even greater force here. And on my last point, how do we do this? In other words, I take it that you're saying that the Court would be holding that the plaintiffs have not met their burden. I'm not saying that they have not met their burden of jurisdiction under the commercial activities exception, because they sufficiently allege only commercial activity occurring before the defendant obtained diplomatic status. Your Honor, it's a two-part inquiry. The first part, in other words, isn't burden still part of the analysis? It is part of the analysis. We're merely saying that in this particular case, part one of the burden in the traditional case is to establish that the diplomat is, in fact, a diplomat. That's been met here. The second part places the burden on the plaintiff to demonstrate that some sort of exception applies. Here, no sort of exception applies. The only potential exception that plaintiffs have identified is the commercial activities exception. And for reasons why we explain in the brief at length, that simply does not apply here to pre-tenure conduct. And that sort of bridges to my final point, to directly address plaintiff's point that there's some sort of daylight between when someone is a diplomatic agent versus immunity. We are aware of no case that recognizes that type of daylight. The restatement itself suggests that, or states that notification and recognition occur before an individual becomes a diplomat. The best case on this point is probably the Abdul Aziz case we cite. It's from the 11th Circuit, not the 2nd Circuit, but it talks about how a court can receive a certification that an individual is a diplomatic agent, and that immunity, quote, flows from that status. And then the final point there is that plaintiff's distinction between diplomatic agent on the one hand and immunity on the other would make courts be the arbiter of deciding when someone is or isn't a diplomatic agent, when there's activity that occurs before notification or recognition. And that simply isn't what has occurred in the past 130 years, with courts giving almost total or total immunity to an individual. It's a total deference to the State Department's certification. If there are no further questions, I would simply like to thank the Court for providing the United States with the opportunity to address it. Thank you. Your Honor, our position is not that this Court has to make a determination. Our position is that the sending State is who determines, are their own diplomats. As you said, Article 7 of the VCDR says that the sending State may freely appoint the members of the staff of the mission. And actually what Abdulaziz says is it is the foreign country that actually ranks its diplomats, not the State Department. Where does that flow from? That flows from the text of the VCDR. The head of the mission in Article 4, there has to be advance notification and agreement before someone can be the head of a mission. That's the highest ranking official with the mission. Article 7 says that a receiving State may, but is not required to, may require preapproval for military attachés, naval attachés, and the like. But no such requirement applies to ranking diplomatic agents under Article 10. Sorry, I left the microphone for a minute. And the commentary, everybody cites DENSA, the Oxford Commentaries on Diplomatic Immunity. What Eileen DENSA says, and this is in the fourth edition, but I think she's said this consistently, taking Article 10, the notification provision, together with Article 7, the provision I just cited, and Article 39.1, it is clear that notification is not a limitation on the right of the sending State to freely appoint members of its diplomatic mission. Yes, Your Honor, our point is there is, when someone is a diplomatic agent, as Morocco said in its October 5th letter, that Ben Amar was on November 1st, 2017, they make that determination. He is our diplomatic agent. And a year later, the U.S. government recognizes, certifies, whatever word you want to use at that point. It's at that point that he's entitled to the privileges, that he enjoys the privileges and immunities that attach to being a diplomatic agent. But the prohibition of Article 42 on commercial activity still applies in the interim when he's acting in his official function as a diplomatic agent. If you read Ben Amar's declaration here, he will say that since November 1st, 2017, he has been doing diplomatic activity at the highest rank for Morocco. And what the position of the United States does here is that it rewards delayed notification. So you grant immunity that's obviously retroactive, and we don't argue that, but for the exception, there wouldn't be immunity. But the United States position means that Morocco, by deferring notification after the appointment of Ben Amar on November 1st, 2017, actually rewards him by allowing him to conduct commercial activity during the interim period. We say, for all sorts of reasons, that is inconsistent with the plain text of the VCDR. Thank you, Your Honor. Thank you. Thank you all for your arguments. The Court will reserve decision. Thank you.